VALLEY NATURAL FUELS, STEVEN ARTHUR RICHARDS, TAX MATTERS PARTNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Valley Natural Fuels v. Commissioner
Docket No. 29717-89
United States Tax Court
T.C. Memo 1991-341; 1991 Tax Ct. Memo LEXIS 390; 62 T.C.M. (CCH) 229; T.C.M. (RIA) 91341; July 25, 1991, Filed *390 Decision will be entered for the respondent. Craig G. Christensen and John E. Barrus, for the petitioner. Steven A. Wilson, for the respondent. COHEN, Judge. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined the following adjustments to Valley Natural Fuels' (VNF) partnership return for 1983, 1984, and 1985: Adjustment
1983
1984
1985
ACRS Depreciation
$     1,653
$ 295,020
$   90,098 Investment Credit
Property
1,490,000
70,000
(299,290)
Business Energy
Credit Property
1,490,000
70,000
(299,290)
The issues for decision are (1) whether VNF's ethanol distillation plant was placed in service in December 1983 or June 1985 for purposes of depreciation and the investment tax credit and business energy credit; (2) whether an agreement executed in 1985 by VNF and the seller of the ethanol distillation plant changed the nature of VNF's promissory obligation to the seller; and (3) whether adjustments to the purchase price of the ethanol distillation plant in 1985 required VNF to recapture investment tax credit and business energy credit that it reported in 1983 and 1984. Unless otherwise indicated, all section references are *391 to the Internal Revenue Code as amended and in effect for the years in issue. FINDINGS OF FACT Some of the facts have been stipulated, and the facts set forth in the stipulations are incorporated in our findings by this reference. VNF's principal place of business at the time the petition was filed was Fresno, California. Steven Arthur Richards (Richards) is the tax matters partner of VNF. Richards and Ken Leister (Leister) each own a 50-percent interest in, and are officers of, High Energy Fuels, Inc. (High Energy), the general partner of VNF. Background
VNF prepared an offering circular in connection with its formation. The offering circular stated that the business of the partnership was as follows: The principal business of the Partnership shall be to acquire and operate an ethanol distillation plant from FreeAn, Inc. The Partnership's objective is to produce and sell Anhydrous Ethanol (198.2+ proof Ethyl Alcohol). Petroleum companies purchase Ethanol to mix with unleaded gasoline to produce octane enhanced "Super Unleaded" gasoline. * * *
Similarly, the marketing plan that was attached to the offering circular stated that VNF anticipated that the primary *392 market for the ethanol that it produced would be independent oil companies in California who sell gasoline/ethanol fuel blends. The offering circular also described the "ethanol industry" and the process of blending ethanol with unleaded gasoline to produce "Super Unleaded" gasoline, a product originally marketed as gasohol. There was no mention of any other use for ethanol in the offering circular. The offering circular projected income and cash flow based on the sale of "199+ proof ethanol." Prior to the time that VNF was formed, Leister, as well as certain officers of FreeAn, explored the potential uses of ethanol and found that there was a potential market in the Midwest for ethanol that was less than 198.2 proof. Such ethanol was used as fuel alcohol for certain farm machinery and equipment. VNF did not, however, include the sale of any such ethanol in its projection of income and cash flow in the offering circular. The actual cash contributions of the partners of VNF during the years in issue totaled $ 231,121. Two of the partners of VNF also executed promissory notes payable to VNF, dated December 30, 1983. These notes recited that they were executed by the maker "as *393 evidence of the * * * [maker's] obligation to pay under the terms and conditions of that certain Certificate and Agreement of Limited Partnership of * * * [VNF]." VNF had not filed a certificate of limited partnership with the State of California as of the end of 1983. The Purchase Agreement
On or about December 30, 1983, VNF agreed to purchase an ethanol distillation plant (the facility) from FreeAn, Inc. (FreeAn), a company formed for the purpose of building ethanol distillation plants. The material terms of that agreement were contained in an unexecuted draft of a purchase agreement (the purchase agreement). The facility constituted section 38 property for purposes of the investment tax credit and energy property for purposes of the business energy credit. VNF agreed to pay FreeAn the sum of $ 1,650,000 for the facility. On December 30, 1983, VNF executed a promissory note payable to FreeAn in the principal sum of $ 1,452,500, together with interest at the rate of 10 percent per annum (the FreeAn note). The FreeAn note provided that payments were to be made on an annual basis in the principal amount of $ 145,250, plus accrued interest. The first payment of principal *394 and interest was due in January 1985. On its books, VNF allocated $ 160,000 of the purchase price to a construction-in-process account, which represented the approximate future cost of a molecular sieve and of the construction of a building. VNF did not include that amount in calculating its investment tax credit and business energy credit. FreeAn warranted that the facility would "operate at the minimum of 1500 gallons of Ethanol per day for a period of 24 months." The purchase agreement provided that VNF's obligation to pay was based upon the completion of the facility and the facility's "ability to produce 199+ proof Ethanol at a rate of 1,500 gallons per day." VNF anticipated problems with the ethanol production equipment. To insure that the plant operated as FreeAn had warranted, a penalty clause was included in the purchase agreement. Operation of the Facility
The facility was first operated in December 1983. As of December 30, 1983, the ethanol produced at the facility was less than 198.2 proof; the facility could not produce 198.2 proof ethanol without a molecular sieve. Actual ethanol production in 1983 was less than 1,500 gallons. At least a portion of that *395 production was used for experiments on machinery at the facility. A molecular sieve was installed in the spring of 1984. It was leased on a long-term basis by VNF from FreeAn for $ 70,000. Also, in 1984, a wood-framed, metal-clad building was constructed at the facility. In late 1984, VNF experienced certain problems with the operation of the facility and with the operation of the molecular sieve. VNF hired Ray Thacker (Thacker), a consultant, to correct these problems. Thacker inspected the facility on December 21, 1984, and provided certain recommendations to VNF. Based upon Thacker's recommendations, VNF installed additional equipment at the facility in 1985. After the installation of the molecular sieve in 1984 and the other equipment in 1985, VNF was able to produce ethanol at the 198.2 proof level. Adjustments to the FreeAn Note
By letter dated December 22, 1984, VNF informed FreeAn that the facility had not yet achieved optimum production and provided FreeAn a summary of Thacker's recommendations that were necessary "to get production to the level indicated by * * * [FreeAn's] warranty." On February 26, 1985, the letter was executed by representatives of VNF *396 and of FreeAn to reflect agreement between them as to changes in VNF's obligation (the February agreement). FreeAn agreed to reduce the purchase price of the facility by $ 160,000 and to forgive principal and interest payments due in 1984 but not paid. The February agreement provided: * * * [FreeAn] agrees to forgive the principle [sic] and interest due to * * * [FreeAn] from * * * [VNF] for the year 1984 and treat it as being paid by * * * [VNF] and that the note due * * * [FreeAn] has been reduced by same. It is also agreed that * * * [VNF] will postpone the enforcement of the penalty clause of the Purchase Agreement for a period of 6 months to allow * * * [FreeAn] to make the required correction to have the plant in optimum production as warranted. It is also agreed that the purchase price as stated in the Purchase Agreement be reduced by $ 160,000.00. The * * * [FreeAn note] will be amended to show the corrected loan amount. * * * It is further agreed that all payments to * * * [FreeAn] from this time forward will [be] made on a percentage of sales made by * * * [VNF]. The terms of these payments are detailed in the accompanying Optional Payment Agreement.
The *397 $ 160,000 reduction to the purchase price reflected the parties' understanding that the molecular sieve was to be treated separately from the purchase agreement; the remainder of the reduction reflected an adjustment to compensate for some of the problems with the facility and for the building that was constructed in 1984. With respect to the "corrected loan amount" referred to in the February agreement, the parties agreed to reduce the FreeAn note by $ 148,183. VNF treated that amount as consulting income for services provided by Leister to FreeAn. FreeAn agreed to forgive interest in the amount of $ 150,463. In 1985, the production of ethanol became economically nonviable for VNF due to the declining price of oil and other external factors. On December 23, 1985, FreeAn agreed to reduce the FreeAn note in the amount of $ 636,823 (December agreement). The December agreement provided: It is hereby agreed between * * * [VNF] and * * * [FreeAn] that for consideration of postponing enforcement of the penalty clause of the purchase agreement until 12/31/86 and because of the production equipment failures experienced to date, * * * [FreeAn] forgives $ 500,000 of the outstanding *398 debt and waives principle [sic] and interest payments on the remaining debt until production and lease income exceeds $ 50,000 per year. 80% of any amounts received by * * * [VNF] over $ 50,000 will go to amortize the remaining balance of the loan to * * * [FreeAn].
In its business records, FreeAn recorded payments received from VNF in the amounts of $ 153,014.25 and $ 7,044.34 in 1984 and 1985, respectively. The last payment was received by FreeAn on March 29, 1985. The majority of these payments were identified as a "downpayment from" VNF; these totals did not include amounts identified as "labor" or "payroll." As of the date of trial of this case in October 1990, the FreeAn note had not been paid in full, and FreeAn had not commenced any collection action on the FreeAn note. Tax Treatment
On its 1983 Federal Partnership Return of Income, VNF reported a basis of $ 1,490,000 in investment credit property and business energy investment credit property and claimed depreciation of $ 1,653 on "ethanol distillation equipment" placed in service in 1983 (the 1983 acquisition). On Schedule L (balance sheet) attached to that return, VNF reported as a current asset the $ 160,000 *399 in its construction-in-process account. VNF also reported gross receipts from the sale of ethanol in the amount of $ 250. On its 1984 Federal Partnership Return of Income, VNF reported a basis of $ 70,000 in investment credit property and business energy investment credit property for the lease of the molecular sieve from FreeAn. VNF claimed depreciation of $ 295.020 on the 1983 acquisition. VNF reported gross receipts of $ 299,418; $ 772 was attributed to sales of ethanol, $ 150,463 was attributed to forgiveness of interest, and $ 148,183 was attributed to consulting income. VNF claimed an interest expense deduction of $ 150,463. No balance was shown for the construction-in-process account on the balance sheet attached to the return. On its 1985 Federal Partnership Return of Income, VNF reported a basis of $ 50,055 in investment credit property and business energy investment credit property for the equipment installed in 1985. VNF claimed depreciation of $ 154,634; $ 147,877 was attributed to the 1983 acquisition, and $ 6,757 was attributed to "ethanol distillation equipment" placed in service on June 30, 1985. VNF reported gross receipts of $ 920 from sales of ethanol. *400 Further, on the 1985 return, VNF excluded from gross income the $ 636,823 reduction to the FreeAn note and filed a Form 982, Reduction of Tax Attributes Due to Discharge of Indebtedness. On the Form 982, VNF elected to treat the $ 636,823 as qualified business indebtedness; VNF attached to the Form 982 a statement explaining that "the basis in ethanol distillation equipment was reduced by the amount of principal discharged on notes payable by a creditor of the company." VNF reduced the basis of the 1983 acquisition in the amount of $ 636,823, and the depreciation that VNF claimed in 1985 was computed on the basis thus adjusted. In the Notice of Final Partnership Administrative Adjustment (FPAA), respondent determined that VNF was not entitled to the investment tax credit or business energy credit in 1983 or 1984 or the depreciation deductions that VNF claimed in those years, because the facility "was not placed in service or in a state of readiness to be placed in service during that time." Corresponding determinations were made for 1985 based on a June 30, 1985, placed-in-service date. ULTIMATE FINDINGS OF FACT The assigned function of the facility was to produce and sell 198.2 *401 proof ethanol to be blended with gasoline to produce gasohol. The facility was not in a condition or state of readiness and availability for its assigned function and was not placed in service prior to June 30, 1985. The February 1985 agreement rendered the FreeAn note nonrecourse and contingent, and it was not thereafter likely to be paid. OPINION Placed in Service
The first issue is whether VNF is entitled to the investment tax credit and business energy credit that it reported and the depreciation deduction that it claimed on the 1983 and 1984 returns. Depreciation and the tax credits are allowed in the year in which the qualifying property is placed in service by the taxpayer. Secs. 38(a), 46(a)(1) and (2), and 46(c)(1); secs. 1.46-3(a)(1), 1.167(a)-10(b), and 1.167(a)-11(e)(1)(i), Income Tax Regs. Petitioner bears the burden of proof. Welch v. Helvering, 290 U.S. 111, 78 L. Ed. 212, 54 S. Ct. 8 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
Section 1.46-3(d), Income Tax Regs., provides in pertinent part: (d) Placed in service. (1) For purposes of the credit allowed by section 38, property shall be considered placed in service in the earlier of *402 the following taxable years: (i) The taxable year in which, under the taxpayer's depreciation practice, the period for depreciation with respect to such property begins; or (ii) The taxable year in which the property is placed in a condition or state of readiness and availability for a specifically assigned function, whether in a trade or business, in the production of income, in a tax-exempt activity, or in a personal activity. Thus, if property meets the condition of subdivision (ii) of this subparagraph in a taxable year, it shall be considered placed in service in such year notwithstanding that the period for depreciation with respect to such property begins in a succeeding taxable year * * * Generally, the provisions of section 1.46-3(d)(1)(ii), Income Tax Regs., apply in determining when property is placed in service for purposes of depreciation. See section 1.167(a)-11(e)(1)(i), Income Tax Regs.
Petitioner's position is that the facility was placed in service on December 30, 1983. Petitioner contends that the assigned function of the facility was to produce a "warranted quantity" of "commercially marketable ethanol, whether such ethanol was 198.2 proof, 190 *403 proof or 150 proof" and that, as of December 30, 1983, the facility was capable of performing this function. Respondent's position is that the facility was not placed in service until June 1985 because: (1) that was the earliest date that the plant could have been ready and available for its specifically assigned function, which was to produce ethanol at 198.2+ proof for purposes of blending with gasoline to make gasohol; (2) all of the components of the facility were not installed until that date; [and] (3) this was the first date that the molecular sieve could be properly synchronized * * * We have found as ultimate facts that the assigned function of the facility was to produce and sell 198.2 proof ethanol to be blended with gasoline to produce gasohol and that the facility could not produce such ethanol until 1985. Thus we agree with respondent for the reasons that follow. Petitioner relies primarily on the testimony of the principals of FreeAn and VNF to support the contention that a "market" existed for ethanol that was less than 198.2 proof and that the facility was capable of producing the warranted quantity of such ethanol. That testimony, however, does not *404 support petitioner's contention. Leister testified that he was aware that a potential use of ethanol, other than 198.2 proof ethanol that was used to produce gasohol, was in certain farm machinery and equipment and that a market for the foregoing existed in the Midwest. VNF did not, however, consider any such potential sales in its projection of income and cash flow in the offering circular; rather, the offering circular projected income and cash flow based solely on the sale of "199+ proof ethanol." Further, the marketing plan attached to VNF's offering circular discussed only the use of 198.2 proof ethanol. In addition, VNF's reported sales of less than 198.2 proof ethanol ($ 250 in 1983, $ 772 in 1984, and $ 920 in 1985) do not support petitioner's contention that an actual market existed for such ethanol. With respect to the 1983 production, Leister testified as follows: Q. Now you said you had willing buyers. Did -- you mentioned this production on December 30th, was everything that was manufactured that day sold? A. I don't know if everything was. In fact, I don't think everything that -- I don't know. I didn't do an audit of -- I remember that there was something *405 sold. I'm not sure exactly how much of it.
Ralph Freeman, the secretary and treasurer of FreeAn, testified that some of the 1983 production was sold to someone who "just wanted to buy the first alcohol produced" and that he did not "know what he did with it or what happened to it." Roy Angus (Angus), a shareholder of FreeAn and one of the primary operators of the facility, testified that the 1983 production was "used * * * for experiments on the machinery around the place." The nature of the reported sales in 1984 and 1985 is equally unclear. Therefore, even though VNF may have been aware that there was a potential use for ethanol that was less than 198.2 proof, petitioner did not establish that VNF contemplated the sale of such ethanol, that any of the ethanol production in the years in issue was actually sold commercially in such a market, or that such a market existed. Moreover, assuming such a market existed, petitioner's contention that the facility was capable of producing the "warranted quantity" of ethanol as of December 30, 1983, is not supported by the testimony relied on by petitioner and discussed below. The warranted quantity of ethanol in the purchase agreement *406 was production at the rate of 1,500 gallons of ethanol per day. Richards' testimony relates to ethanol production in 1984 and, in any event, does not establish that the facility was capable of producing 1,500 gallons of ethanol per day as of December 30, 1983. Ralph Freeman testified that the facility could produce "65 to 70 gallons an hour"; he also testified that, at the most, the facility was run "eight to ten hours at a time." This does not equate to 1,500 gallons per day. Moreover, this testimony similarly relates to 1984. Finally, Angus testified as follows: Q. Okay. As of -- December 1983, could you estimate the capacity of the plant in terms of gallons per day? A. With everything working right, it would be probably a thousand gallons a day. Q. A thousand gallons a day? A. We didn't do anywheres near that but we could have.
Thus, the most optimistic estimate was that, as of December 30, 1983, the facility could produce 1,000 gallons per day. Further, the parties executed the February agreement because the facility had not operated at "optimum" production levels, and the parties executed the December agreement because of "equipment failures." It is apparent *407 from the evidence that, as of December 30, 1983, the facility was not capable of producing the "warranted quantity" of ethanol.
Finally, our finding that the assigned function of the facility was to produce 198.2 proof ethanol is supported by VNF's stated business purpose. VNF's express objective, as stated in the offering circular, was to "produce and sell Anhydrous Ethanol (198.2+ proof Ethyl Alcohol)" to petroleum companies who "purchase Ethanol to mix with unleaded gasoline to produce octane enhanced 'Super Unleaded' gasoline." The marketing plan stated that VNF anticipated that the primary market for the ethanol that it produced would be independent oil companies in California who sell gasoline/ethanol fuel blends. Further, under the terms of the purchase agreement, VNF's obligation to pay was based upon the completion of the facility and the facility's "ability to produce 199+ proof Ethanol at a rate of 1,500 gallons per day." Petitioner next argues that, although the "clearly stated initial business objective of * * * [VNF] was to produce 198.2+ proof ethanol, " it is improper to assume that "the taxpayer's business objective must automatically equate to the assigned *408 function of the taxpayer's equipment." Petitioner cites no authority in support of this argument. Furthermore, we are unable to discern such a differentiation based on the facts in this case. In a related argument, petitioner asserts that the facility consisted of three independent components -- the ethanol still, the building, and the molecular sieve -- and that: the * * * [facility], without installation of the molecular sieve, was a completely operable and commercially viable facility as of December 30, 1983. Installation of the molecular sieve in 1984 upgraded the quality (but not quantity) of the ethanol which could be produced but did not change the fundamental nature of the facility as a viable ethanol producing plant.
Petitioner relies on Cornfeld v. Commissioner, 254 U.S. App. D.C. 382, 797 F.2d 1049 (D.C. Cir. 1986), revg. a Memorandum Opinion of this Court, which he contends stands "for the proposition that property may be considered placed in service when acquired and used for an interim business purpose (or 'function')." In this case, however, the facility was not actually used in an interim business. Petitioner also relies on Fort Howard Paper Co. v. Commissioner, T.C. Memo 1977-422, *409 and argues that, in the instant case, "the building was ready and available for its function of housing distillation equipment, even though the molecular sieve had not been installed," and that "therefore, * * * the building was placed in service in 1984." In this case, however, the building was not the asset on which the items in dispute were claimed and disallowed. The distillation equipment is the asset in question, and it was not in a state of readiness and availability for its specifically assigned function in 1984. Finally, petitioner relies on Sears Oil Co. v. Commissioner, 359 F.2d 191 (2d Cir. 1966), and SMC Corp. v. United States, 1980 U.S. Dist. LEXIS 13752, 46 A.F.T.R.2d (RIA) 5827, 80-2 U.S. Tax Cas. (CCH) P9642 (E.D. Tenn. 1980), affd. per curiam 675 F.2d 113 (6th Cir. 1982). Petitioner argues: The foregoing cases stand for the sole proposition that the equipment may be considered "placed in service" during the taxable year even though not actually used during that year. In the instant case, Petitioner actually operated the facility during the taxable year * * *.
The property at issue in each of those cases was in a state of readiness *410 and availability to perform its assigned function, although not actually used by the taxpayer during the year in issue due to circumstances beyond the control of the taxpayer. The facts in those cases are distinguishable from the facts in the instant case, where operations were not at or near the intended level of production. Respondent argues that the resolution of the placed-in-service issue is controlled by our decision in Consumers Power Co. v. Commissioner, 89 T.C. 710 (1987). In that case, the taxpayer began construction of a hydroelectric power plant in 1969. In September 1972, the taxpayer received final approval from the Federal Power Commission to begin regular operation of the plant, subject to the successful completion of preoperational testing on a particular unit (unit 1). In October 1972, as part of preoperational testing, unit 1 began pumping water. In November 1972, the generating mode of unit 1 was placed on line. From November 18, 1972, through December 5, 1972, unit 1 generated electrical power, substantially all of which was sold to the taxpayer's customers. On December 7, 1972, electrical power to unit 1 was disrupted, causing damage *411 to the unit. Unit 1 temporarily was shut down for repairs. Preoperational testing resumed on January 9, 1973, and was completed on January 17, 1973. The taxpayer formally accepted unit 1 on that date. Respondent determined that the plant was not placed in service in 1972. We rejected the taxpayer's contention that unit 1 was placed in service in 1972 because it actually pumped water and generated electrical power as of that date, and we stated: Although unit 1 pumped water into the reservoir and generated electrical power during preoperational testing in 1972, unit 1 was not available in 1972 to provide electrical power on a regular basis in 1972. * * * The generation of electrical power and the pumping of water into the upper reservoir were both necessary parts of preoperational testing. * * * Not until January 17, 1973, after unit 1 successfully had completed all phases of preoperational testing, thereby demonstrating that it was available for service on a regular basis, was the unit in a state of readiness and availability for its specifically assigned function within the meaning of sections 1.46-3(d)(1)(ii) and 1.167(a)-11(e)(1)(i), Income Tax Regs. [Consumers Power Co. v. Commissioner, 89 T.C. 710, 724 *412 (1987.]
Petitioner attempts to distinguish Consumers Power Co. First, petitioner argues that, in Consumers Power Co., the "taxpayer did not 'formally accept' the facility until the following tax year," whereas "Petitioner 'formally' accepted the * * * [facility] on December 30, 1983." We do not believe that this is a fair characterization of the facts in this case; but this point is not dispositive. Rather, our analysis in Consmers Power Co. was dependent on whether the plant at issue "was available for service on a regular basis" and hence in a state of readiness and availability for its specifically assigned function. 89 T.C. at 724. Second, petitioner argues that, as of December 30, 1983, VNF, unlike the taxpayer in Consumers Power Co., had completed all preoperational testing of the facility. The facility was first operated in December 1983; the amount of "testing," if any, that had been conducted prior to December 30, 1983, is not clear. Regardless of the amount of "preoperational testing," however, the facility, unlike the hydroelectric plant in Consumers Power Co., was not capable of performing its assigned function as of December *413 30, 1983. Petitioner also argues that "The period from December 30, 1983, to June 30, 1985, which Respondent characterizes as the preoperational testing period, is more accurately the postoperational shakedown period discussed in * * * [sec. 1.46-3(d)(2)(iii), Income Tax Regs.]." Section 1.46-3(d)(2)(iii), Income Tax Regs., furnishes an example where property acquired by the taxpayer for use in a trade or business shall be considered in a condition or state of readiness and availability for a specifically assigned function; the example in that section states that property is in such a condition or state of readiness when "Equipment is acquired for a specifically assigned function and is operational but is undergoing testing to eliminate any defects." (Emphasis supplied.) The cited regulation does not require that property be free of all flaws and defects as of the time that it is first operated; ultimately, however, the property must be operating in the fulfillment of its specifically assigned function. See Noell v. Commissioner, 66 T.C. 718, 728-729 (1976). The ethanol distillation facility in this case was not capable of performing its specifically assigned *414 function without a molecular sieve, which was not installed until 1984. After the sieve was installed, petitioner acknowledges that "additional refinements and enhancements" were required to enable the facility to produce 198.2 proof ethanol. These "refinements and enhancements" were not completed until 1985. The installation of the molecular sieve in 1984 and the additional refinements and enhancements in 1985 are significant and are more than mere "testing" to eliminate defects. In Consumers Power Co. v. Commissioner, 89 T.C. 710 (1987), we held that the hydroelectric plant at issue "must be viewed as one integrated unit because the physical plant and the reservoir operate simultaneously and as a unit in order to produce electrical power." 89 T.C. at 726. Our holding was based in part on Hawaiian Independent Refinery v. United States, 697 F.2d 1063 (Fed. Cir. 1983), wherein the Court of Appeals for the Federal Circuit concluded that the "component assets" of an oil refinery complex "'functionally [formed] a single property' and held that the entire refinery complex was to be treated as a single asset for purposes of the *415 investment credit." Consumers Power Co. v. Commissioner, 89 T.C. at 726. We similarly conclude that the ethanol still, which was constructed in 1983, the molecular sieve, which was installed in 1984, and the additional equipment, which was installed in 1985, were component assets of the facility and "functionally formed a single property." Only after all of these component assets were installed and functioning did the facility constitute a complete unit that was operational and served the purpose intended by petitioner, to wit, the production of 198.2 proof ethanol. On its 1985 return, VNF reported that the additional equipment installed in 1985 was placed in service on June 30, 1985. Accordingly, we conclude that the facility was not placed in service for purposes of depreciation and the investment tax credit and business energy credit prior to that date. Effect of the February Agreement
The second issue is whether the February agreement affected VNF's liability to FreeAn in that the FreeAn note is not properly includable in VNF's basis for purposes of depreciation and the investment tax credit and business energy credit. VNF is a partnership within *416 the meaning of section 6231(a) and is therefore subject to the unified audit and litigation proceedings for partnership items under sections 6221 through 6233. Section 6221 provides that the tax treatment of any "partnership item" shall be determined at the partnership level. Section 6231(a)(3) defines a partnership item as "any item required to be taken into account for the partnership's taxable year" to the extent that regulations provide that such item is more appropriately determined at the partnership level than at the partner level. Section 301.6231(a)(3)-1(a)(1)(v), Proced. & Admin. Regs., provides that the determination of the partnership aggregate and each partner's share of "Partnership liabilities (including determinations with respect to the amount of the liabilities, whether the liabilities are nonrecourse, and changes from the preceding taxable year)" is a "partnership item." Respondent determined in the FPAA that only the actual costs of the molecular sieve and the additional equipment installed in 1985 and the actual cash payments made to FreeAn with respect to the FreeAn note were properly included in VNF's basis for purposes of computing depreciation and the *417 investment tax credit and business energy credit on the facility. Respondent concedes that the FreeAn note constituted recourse financing from 1983 through February 26, 1985, the date that the February agreement was executed. Respondent, however, argues that, as a result of the February agreement, the promissory note was converted from recourse to nonrecourse financing. Although basis for purposes of depreciation and the investment tax credit and business energy credit normally includes valid indebtedness, a liability is not includable in basis unless its repayment is reasonably certain. We look to the substance of the purported debt, and not its form, to determine the tax consequences. See Waddell v. Commissioner, 86 T.C. 848, 902 (1986), affd. per curiam 841 F.2d 264 (9th Cir. 1988), and cases cited therein. Even if an obligation is recourse, it will not be treated as a true debt where, pursuant to its terms, payment is too contingent. 86 T.C. at 901. In Waddell, with respect to the taxpayers' "facially recourse note," we stated: If on the basis of all the facts and circumstances we cannot conclude that payment of *418 * * * [the taxpayers'] purchase money note was reasonably likely, we cannot include the note as part of their basis for tax purposes. [Waddell v. Commissioner, 86 T.C. at 903.]
Petitioner contends that both VNF and FreeAn "believed and understood that the February Agreement did not relieve the Partnership, or any individual partner, of liability for the * * * [FreeAn note]." To determine the substance of the transactions at issue, however, we must look at both the language of the agreement and its effect. The February agreement, as set forth above in our findings of fact, provided: It is further agreed that all payments to * * * [FreeAn] from this time forward will [be] made based on a percentage of sales made by * * * [VNF]. The terms of these payments are detailed in the accompanying Optional Payment Agreement.
Petitioner did not produce the "Optional Payment Agreement." Petitioner argues that, notwithstanding language expressly stating that all payments were to be made "based on a percentage of sales," the February agreement does not purport to relieve VNF of any legal liability. We are not persuaded, however, that the parties to the *419 agreement intended that VNF would make payments on the FreeAn note from any source other than the sale of ethanol produced at the facility. As petitioner acknowledges, the February agreement was entered into to reflect concessions of the parties resulting from "production and equipment difficulties" at the facility. Richards testified: We previously referred to the penalty clause that is mentioned on page one of * * * [the February agreement] which postponed the -- any attempt by us to enforce that penalty clause for six months in exchange for the concessions that were made by FreeAn. One of those concessions is that we would pay them on a percentage basis. We felt that within six months that we would be able to have production that would pay them a significant amount of money. It was conceivable that the production would result in enough income that they would be -- they would have a greater amortization of the note than we had previously agreed to.
Although Richards asserted that the agreement did not negate any obligation to FreeAn, he did not acknowledge an obligation to pay from any other source. Further, the December agreement provided that FreeAn would waive all *420 principal and interest payments until production income exceeded a certain level. This supports our conclusion that, as of the date of the February agreement, the parties expected that the sole source of payments on the FreeAn note was income from the sale of ethanol produced at the facility. The inference that repayment of the FreeAn note was not reasonably likely, as of 1985, is supported by the testimony of Ralph Freeman, who testified as follows with respect to the economic conditions and the state of the facility in 1985: A. To my best recollection, we were economically unable to -- I say "we," Valley Natural Fuels was economically unable to operate the plant because of various -- well, the depletion of oil -- the depletion, that's the wrong word -- the downward spiral -- Q. Decrease? A. -- decreasing of oil prices and at the pumps the oil price had diminished considerably and -- causing a reflection upon the price of ethanol as well as the State of California had also done away with its particular fuel incentive program and there was -- it was virtually economically not sound. So we were unable to -- when I say "we," the Valley Natural Fuels was somewhat unable to *421 operate the facility because of that particular condition * * * .
At the time that the parties entered the February agreement, VNF had not produced 198.2 proof ethanol and had not shown that it had the capability to realize any substantial profits therefrom. Further, given the state of the ethanol market and the lack of economic incentives, the ability of the facility to generate any profits from the sale of ethanol at that time was unlikely. If the facility was not then capable of generating sufficient production, no payments would be forthcoming; hence, there was no fixed and definite date for repayment. Moreover, with respect to petitioner's contention that the February agreement did not affect VNF's liability to FreeAn, Ralph Freeman testified as follows: Q. So you believe they're still -- the partnership is still responsible to FreeAn for the payment of that promissory note? A. Well, exactly, yeah. Q. Okay. Has that promissory note been paid in full? A. It has not. Q. Have you ever considered bringing an action to collect the promissory note, the balance of the promissory note? A. I would say no, we have not. Q. You have not, and why is that? A. Well, *422 it was no absolute fault of theirs that the facility was not able to -- to operate, as it was not our fault either. It was just an economic condition which persisted and it didn't affect only us but it affected nearly every ethanol plant in the country and that particular business and so we didn't pursue them personally. * * *
Although Thomas Freeman, the president of FreeAn, had been served with a subpoena to produce the original note at trial, he produced neither the original nor a copy of the note. The failure to do so was not explained. Considering the quoted testimony and the entire record, we do not believe that FreeAn intended to or could have enforced the FreeAn note according to its terms in the event that the facility did not generate sufficient revenue. In light of the above, we conclude that after February 1985 the FreeAn note was payable only out of revenues generated by, or assets used in, the activity and that, due to the problems with the facility and the then prevailing economic conditions, payment of the FreeAn note was not reasonably likely. The FreeAn note is not includable in VNF's basis for purposes of computing depreciation and the investment tax *423 credit and business energy credit. Accordingly, inasmuch as petitioner has failed to establish that VNF paid to FreeAn amounts in excess of the amounts that respondent determined were paid on the FreeAn note, we sustain respondent's determinations in the FPAA. Because of our conclusion, we need not address respondent's contention that the reductions to the FreeAn note resulted in a recapture of investment tax credit and business energy credit in 1985, the year that the facility was placed in service. See section 47(a)(1) and section 1.47-2(a)(2)(i), Income Tax Regs. We have considered the other arguments of the parties, and they do not affect our decision. To reflect the foregoing, Decision will be entered
for the respondent.